*Seth D. Jedlicka v. State of Maryland*
No. 30, September Term 2021


**Criminal Procedure – Constitutional Law – Juvenile Offenders – Life Sentences.** In *Carter v. State*, 461 Md. 295 (2018), the Court set forth a test for determining whether a lengthy term-of-years sentence with a significant period of parole ineligibility is a *de facto* sentence of life without the possibility of parole, which the Eighth Amendment forbids for juvenile non-homicide offenders. Under that test, an aggregate 60-year sentence with parole eligibility after 25 years is not a *de facto* life sentence.

**Criminal Procedure – Constitutional Law – Sentencing of Juvenile Offender.** A sentence of life with all but 60 years suspended is not grossly disproportionate for a juvenile offender convicted of first-degree felony murder.

**Criminal Procedure – Constitutional Law – Sentencing of Juvenile Offender – Individualized Consideration.** As outlined in *Miller v. Alabama*, 567 U.S. 460 (2012), before a court sentences a juvenile offender to life in prison without the possibility of parole, the Eighth Amendment to the United States Constitution requires that the offender receive an individualized sentencing proceeding in which the sentencing court has discretion to impose a lesser sentence and can consider the offender's youth and attendant circumstances as mitigating factors. This requirement applies only to cases in which a juvenile homicide offender is sentenced to life without parole and not to cases involving a lesser sentence.

**Criminal Procedure – Constitutional Law – Maryland Constitution – Sentencing of Juvenile Offender.** Article 25 of the Maryland Declaration of Rights is generally interpreted coextensively with the Eighth Amendment of the United States Constitution. In general, Article 25 does not require a different process than the Eighth Amendment for the sentencing of a juvenile offender who receives a sentence of life in prison with the possibility of parole.

Circuit Court for Cecil County
Case No. 07-K-10-000470
Argued: January 11, 2022

IN THE COURT OF APPEALS
OF MARYLAND

No. 30

September Term, 2021

_____

SETH D. JEDLICKA

V.

STATE OF MARYLAND

_____

*Getty, C.J.,
*McDonald
Watts
Hotten
Booth
Biran
Gould,

JJ.

_____

Opinion by McDonald, J.

_____

Filed: August 26, 2022

*Getty, C.J., and McDonald, J., now Senior Judges, participated in the hearing and conference of this case while active members of this Court. After being recalled pursuant to Maryland Constitution, Article IV, §3A, they also participated in the decision and adoption of this opinion.

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

Over the last two decades, there have been significant developments in the law governing the sentencing, and the potential release from confinement, of juvenile offenders who commit serious crimes. Changes have come at the state and federal levels, through both the courts and the legislative process. The Supreme Court has held that the Eighth Amendment to the United States Constitution categorically forbids sentencing a juvenile non-homicide offender to life without the possibility of parole and requires an individualized sentencing process before such a sentence may be imposed on a juvenile homicide offender.[1] This Court has determined that certain lengthy sentences expressed as a term of years with a lengthy period of ineligibility for parole may be *de facto* sentences of life without parole and therefore may also violate the Eighth Amendment when imposed on juvenile non-homicide offenders.[2] The General Assembly has both reformed the parole process and, for juvenile offenders sentenced as adults, provided another avenue for release of those who can demonstrate maturity and rehabilitation following a substantial period of incarceration.[3]

In 2010, Petitioner Seth Jedlicka was convicted of first-degree felony murder and other crimes for his involvement, at age 16, in a burglary that resulted in the murder of one of the victims. In 2011, he was sentenced to life in prison with all but 60 years suspended

---

[1] *Graham v. Florida*, 560 U.S. 48 (2010); *Miller v. Alabama*, 567 U.S. 460 (2012).

[2] *Carter v. State*, 461 Md. 295 (2018).

[3] Chapter 61, Laws of Maryland 2021 (Juvenile Restoration Act); Chapter 30, 1st Spec. Sess., Laws of Maryland 2021 (eliminating requirement for Governor's approval for parole of inmate serving life sentence).

for the murder conviction and a concurrent aggregate 60-year sentence for the other offenses. He will be eligible for parole after serving 25 years of his sentence, at which time he will be 42 years old. Mr. Jedlicka filed a motion to correct an illegal sentence arguing that his sentencing proceeding failed to comply with the constitutional protections recognized in recent decisions of the Supreme Court and this Court.

The Circuit Court and the Court of Special Appeals both rejected Mr. Jedlicka's argument. We agree. Mr. Jedlicka's sentence is not a *de facto* sentence of life without parole. He will have multiple meaningful opportunities for release based on demonstrated maturity and rehabilitation with a hope of spending some significant portion of his life outside of prison. And, in any event, his sentencing proceeding did not violate the Eighth Amendment's application to certain juvenile offenders, as construed by recent Supreme Court decisions.

**I**

**Background**

***A.*** ***Developments in the Sentencing of Juvenile Offenders***

1.     Recent Case Law on Life Sentences and Juvenile Offenders

*Prohibiting life without parole sentences for juvenile non-homicide offenders*

In 2010, in the first of a series of four decisions on life sentences and juvenile offenders, the Supreme Court held that, for a juvenile non-homicide offender, the Eighth Amendment forbids imposition of a sentence of life without parole. *Graham v. Florida,*

560 U.S. 48 (2010).[4]  Such offenders must have "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Id.* at 75.  The Court held that the Eighth Amendment's prohibition of cruel and unusual punishment embodies the "precept of justice that punishment for crime should be graduated and proportioned to the offense." *Id.* at 59, quoting *Weems v. United States*, 217 U.S. 349, 367 (1910).  The Court acknowledged that "when compared to an adult murderer, a juvenile offender who did not kill or intend to kill has a twice diminished moral culpability.  The age of the offender and the nature of the crime each bear on the analysis." *Id.* at 69.  The Court also determined that none of the four legitimate penological objectives – retribution, deterrence, incapacitation, and rehabilitation – justified such a sentence. *Id.* at 71.  Thus, in the specific case of juvenile non-homicide offenders, the punishment of life without parole is categorically disproportionate.

*Dealing with* de facto *sentences of life without parole*

Applying the holding in *Graham*, this Court later held that a lengthy term-of-years sentence with a remote possibility of parole can, in certain circumstances, be a *de facto* sentence of life without parole that is also prohibited by the Eighth Amendment for juvenile offenders.  *Carter v. State*, 461 Md. 295, 350 (2018).  This conclusion was a matter of common sense; otherwise, a sentencing court could easily circumvent the constraints of the Eighth Amendment by stating a sentence in numerical terms that exceed any reasonable possibility of parole during the defendant's life.  *Id.* at 347-49.  The Court also concluded

---

[4] The other three cases are *Miller v. Alabama*, 567 U.S. 460 (2012); *Montgomery v. Louisiana*, 577 U.S. 190 (2016); and *Jones v. Mississippi*, 141 S. Ct. 1307 (2021).

3

that no penological theory justified treating a sentence that effectively condemned a juvenile non-homicide offender to die in prison any differently than an explicit sentence of life without parole. *Id.* at 350.

The Court's holding in *Carter* necessarily raised the question of *when* a term of years is a *de facto* life-without-parole sentence that offends the Eighth Amendment. The Court declined to identify a specific period of parole ineligibility that equates to a *de facto* life sentence without parole. A complicating aspect of some term-of-years sentences is that they aggregate penalties imposed for multiple criminal episodes. When determining whether a given sentence is cruel or unusual, a reviewing court cannot ignore the context in which the sentence was imposed. Thus, the Court outlined a two-step analysis in which a reviewing court determines (1) whether the terms of the sentence potentially equate to life without parole, and (2) when the sentence is an aggregate one based on multiple convictions, whether the crimes underlying those convictions are closely related in time and circumstance.

The first part of the analysis, which applies to any term-of-years sentence, assesses the period of parole ineligibility in light of certain "benchmarks." The benchmarks identified in *Carter* included: (1) the offender's natural life expectancy; (2) the parole eligibility of an offender serving a life sentence; (3) a 50-year threshold; (4) legislative reforms in the wake of *Graham*; and (5) the typical retirement age. 461 Md. at 351-56. The Court did not explicitly adopt any single benchmark, preferring instead to allow reviewing courts flexibility in conducting the analysis.

When a lengthy term-of-years sentence results from a single conviction, the reviewing court need not look beyond the benchmarks to assess whether the sentence is in fact one of life without parole. However, the second step is required when a particular sentence that appears under the benchmarks to equate to a *de facto* sentence of life is actually the aggregate of multiple sentences for different convictions. This second step applies only to "stacked" sentences that represent the aggregation of multiple terms of incarceration. 461 Md. at 356-61. Here, the *Carter* Court borrowed two related principles from prior cases regarding proportionality – that whether a sentence is excessive under the Eighth Amendment "can never be litigated in the abstract but must be assessed on a case-by-case basis" and that "proportionality [is measured] not by comparing the sentence with the label of the crime … but by comparing the sentence with the behavior of the criminal and the consequences of his act." *Id*. at 356, quoting *Thomas v. State*, 333 Md. 84, 97 (1993). To guide courts in conducting a similar case-by-case review in the specific context of identifying a *de facto* life-without-parole sentence, the Court sketched out a spectrum of juvenile offender culpability:

> … At one end of the spectrum, an individual may embark on a serious crime spree, involving, for example, a series of armed robberies or sexual assaults over weeks or months or even years. Whether the crimes are prosecuted together or separately, the courts may sentence the individual to significant periods of incarceration for each incident. These circumstances are least likely to warrant the aggregate sentence being treated as a *de facto* life sentence. The number of crimes, their seriousness, and the opportunity for the juvenile to reflect before each bad decision also makes it less likely that the aggregate sentence is constitutionally disproportionate even after taking youth and attendant characteristics into account.
>
> At the other end of the spectrum is a situation where an individual is involved in one event or makes one bad decision that, for various reasons,

5

may involve several separate crimes that do not merge into one another for sentencing purposes and for which consecutive sentences may be imposed. Here, the argument to treat a lengthy stacked sentence as if it were a *de facto* life sentence is strongest. There is little, if any, opportunity to reflect upon or abandon the underlying conduct between individual offenses. The initial decision should usually be treated the same as one to commit a single criminal offense carrying a sentence of life without parole.

*Id.* at 356-57.[5]

*Individualized sentencing process*

In *Miller v. Alabama*, 567 U.S. 460, 479 (2012), the Supreme Court held that "the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." The Court reasoned that "[b]y making youth (and all that accompanies it) irrelevant to imposition of that harshest prison sentence, such a scheme poses too great a risk of disproportionate punishment." *Id.* In *Montgomery v.*

---

[5] In *Carter*, the Court applied this two-step analysis to a case of a defendant who had been sentenced to serve four consecutive 25-year terms – *i.e.,* a total of 100 years in prison – for convictions on four counts of first-degree assault. Under Maryland Code, Correctional Services Article, §7-301(c)(1)(i), the defendant would not be eligible for parole until he had served half of the aggregate sentence for violent crimes – 50 years. The Court concluded that the sentence, if it had been imposed for a single conviction, would be considered a *de facto* sentence of life without parole under most of the benchmarks: the 50-year period of parole ineligibility far exceeded the time of parole eligibility for a defendant sentenced to life in prison in Maryland (15 years at that time), exceeded the threshold duration recognized by most courts and legislatures (significantly less than 50 years), and would not afford the defendant an opportunity for release until after the typical retirement date for someone of his age. 461 Md. at 362.

The Court therefore moved on to the second step of the analysis. It determined that the circumstances of the defendant's stacked sentence were toward the lower end of the spectrum. While the crimes were serious, they were all part of a single, brief incident. Moreover, the defendant had been convicted as an aider and abettor of the offenses, rather than as a principal. The Court concluded that the defendant's aggregate sentence amounted to one of life without parole and concluded that he must be resentenced to comply with the Eighth Amendment, as interpreted in *Graham*. 461 Md. at 363-64.

6

*Louisiana*, 577 U.S. 190, 208-09 (2016), the Court clarified that *Miller* announced a substantive rule of constitutional law with retroactive effect. The Court explained that *Miller*'s substantive guarantee – that a juvenile convicted of homicide will not be subject to a mandatory sentence of life without parole – necessarily has a procedural component, namely, "a hearing where 'youth and its attendant characteristics' are considered as sentencing factors." *Id.* at 209-10, quoting *Miller*, 567 U.S. at 465.

*Miller* and *Montgomery* did not impose a formal factfinding requirement to satisfy the procedural component, instead leaving it to the states to implement the Court's holding within their own criminal legal systems. *Montgomery*, 577 U.S. at 211. This led to some confusion regarding what procedure, if any, a sentencing court must follow before imposing a discretionary life without parole sentence for a juvenile homicide offender. The Supreme Court recently addressed this issue, holding that "[i]n a case involving an individual who was under 18 when he or she committed a homicide, a State's discretionary sentencing system is both constitutionally necessary and constitutionally sufficient." *Jones v. Mississippi*, 141 S. Ct. 1307, 1313 (2021). The Court explained that an on-the-record sentencing explanation is not required; "if the sentencer has discretion to consider the defendant's youth, the sentencer necessarily *will* consider the defendant's youth, especially if defense counsel advances an argument based on the defendant's youth." *Id.* at 1319 (emphasis in original).

2.      The Juvenile Restoration Act

In 2021, the General Assembly enacted the Juvenile Restoration Act ("JUVRA") over the Governor's veto. Chapter 61, Laws of Maryland 2021, *codified at* Maryland Code,

7

Criminal Procedure Article ("CP"), §§6-235, 8-110. JUVRA made three significant changes to sentencing practices in Maryland for juvenile offenders convicted as adults. Specifically, it gave a sentencing court discretion to impose a sentence less than the minimum otherwise required by law, prospectively banned sentences of life without the possibility of parole, and authorized a juvenile offender sentenced before its effective date (October 1, 2021) who has spent more than 20 years in prison to file a motion to reduce the remaining sentence. Only the final provision is relevant here.

An eligible offender who files a motion to reduce the offender's remaining sentence is entitled to a hearing at which the offender must be present, either in person or by video. CP §8-110(b). Notice of the hearing must be given to the victim or the victim's representative. *Id.* Both the offender and the State may introduce evidence in support of or in opposition to the motion. *Id.* Following the hearing, the court may reduce the duration of the offender's sentence if the court concludes that (1) the individual is not a danger to the public; and (2) the interests of justice will be better served by a reduced sentence. CP §8-110(c). The statute outlines 10 factors – as well as "any other factor the court deems relevant" – that a court is to consider and address in a written decision, including: the individual's age at the time of the offense; the nature of the offense and the history and characteristics of the individual; any statement offered by or on behalf of a victim of the offense; whether the individual has demonstrated maturity, rehabilitation, and fitness to reenter society; the extent of the individual's role in the offense and whether and to what extent an adult was involved in the offense; and the diminished culpability of a juvenile as compared to an adult. CP §8-110(d). If the offender's motion is denied or granted in part,

8

the offender may file another motion after three years. A third and final motion may be filed after an additional three-year waiting period. CP §8-110(f). Relief sought under JUVRA is distinct from and does not affect other terms of the sentence, such as the offender's opportunity to seek parole.

## B.      *Facts and Proceedings*

### 1.      The Burglary and Murder

In November 2009, Mr. Jedlicka, then age 16, participated in a late-night home invasion in Cecil County with three other young men: Joel Milburn (19), Anthony Melchor (16), and Karl Gladden-Postles (21). Mr. Milburn, the ringleader, believed that there was money in the home and had recruited the others to commit the burglary. In the middle of the night, the four conspirators forcefully entered the home while its occupants – Terry, Geraldine, Terri Ann, and Tara McCoy – slept. At least three of the young men, including Mr. Jedlicka, carried firearms.

Several of the men, including Mr. Jedlicka, forced their way into the bedroom of Terry and Geraldine McCoy, threatening to shoot them. During the episode, one of the assailants struck Terry McCoy in the eye, causing permanent injury. Terry and Geraldine McCoy were then ordered to unlock two safes, which were emptied by the assailants. In another room of the house, Mr. Gladden-Postles fatally shot Terri Ann McCoy. Shortly thereafter, the group fled the house with jewelry taken from the McCoys' safes. They made their way to Mr. Jedlicka's home in Delaware, where they stored the jewelry until they sold it some days later.

In February 2010, police obtained an arrest warrant for Mr. Jedlicka, but were unable to locate him at his residence in Delaware. A month later, he and Mr. Milburn were apprehended in Miami, Florida.

2. The Trial and Sentencing

The four participants in the burglary were indicted in the Circuit Court for Cecil County. Three of the conspirators pled guilty; Mr. Jedlicka elected a bench trial. Mr. Melchor, who had pled guilty to armed robbery pursuant to a plea agreement with the State, testified at the trial and identified Mr. Jedlicka as one of the participants in the home invasion.

At the conclusion of the three-day trial in September 2010, the Circuit Court found Mr. Jedlicka guilty of common law conspiracy, first-degree felony murder, armed robbery, first-degree assault, first-degree burglary, theft of property valued over $100,000, and use of a firearm in the commission of a felony.

Mr. Jedlicka was sentenced on May 14, 2011. The State sought a sentence of life without the possibility of parole. Defense counsel, emphasizing Mr. Jedlicka's youth and diminished role in the offense, asked for a sentence of life imprisonment with all but 15 years suspended. A pre-sentence investigation report was completed. In addition, the defense offered the testimony of a clinical psychologist who had evaluated Mr. Jedlicka and produced a report concerning his potential for rehabilitation that was submitted to the court. The psychologist, formerly an official at the Patuxent Institution, testified that he believed that Mr. Jedlicka was suitable for placement in the youth program at Patuxent.

In announcing Mr. Jedlicka's sentence following the psychologist's testimony, the Circuit Court stated that it was "extremely difficult" to devise an appropriate sentence. The court referred to the sentences given to two of Mr. Jedlicka's conspirators following their guilty pleas. Mr. Milburn, whom Mr. Melchor had identified as the mastermind of the burglary, had pled guilty to first-degree murder and was sentenced to life imprisonment with all but 40 years suspended. Mr. Gladden-Postles, the shooter, had pled guilty mid-trial to first-degree murder and received a sentence of life imprisonment with all but 75 years suspended. The court explained that, in its view, "Mr. Jedlicka should not serve a sentence as long as the shooter, but I think he certainly deserves a sentence longer than that given to Mr. Milburn." Accordingly, the court sentenced Mr. Jedlicka to life imprisonment with all but 60 years suspended for the first-degree murder conviction and imposed an aggregate concurrent term of 60 years of incarceration followed by five years of probation, comprised of consecutive sentences for the armed robbery (20 years), first-degree assault (15 years), first-degree burglary (10 years), theft (10 years), firearms offense (5 years), and conspiracy (suspended sentence) charges. Thus, the overall sentence was a 60-year period of incarceration to be followed by five years of probation.

Mr. Jedlicka appealed, and the Court of Special Appeals affirmed his convictions in an unreported opinion. *Jedlicka v. State*, No. 197, Sept. Term 2011 (Md. Ct. Spec. App. May 16, 2012).

3.      Parole Eligibility

A defendant who was sentenced to life in prison before October 1, 2021, as Mr. Jedlicka was, is eligible for parole after serving 15 years (or the equivalent of 15 years

11

taking into account diminution credits).  Maryland Code, Correctional Services Article ("CS"), §7-301(d)(1)(i).  However, a different period for parole eligibility pertains to the concurrent term-of-years sentence that he is serving.  In particular, an offender serving a term-of-years sentence for violent crimes must serve half of the aggregate sentence for those violent crimes before becoming parole eligible.  CS §7-301(c)(1)(i).  The Parole Commission has determined that 50 years of Mr. Jedlicka's 60-year aggregate sentence correspond to convictions for violent crimes – all but the 10 years for the theft conviction.  Accordingly, he becomes eligible for parole after serving 25 years of that aggregate sentence.

When an offender is serving concurrent terms of imprisonment with different parole eligibility dates, the longer period for parole eligibility controls.  CS §7-301(c)(1)(ii).  The parties agree that Mr. Jedlicka will be for eligible for parole in March 2035 after serving 25 years in custody.

4.     Motion to Correct an Illegal Sentence

On August 29, 2017, Mr. Jedlicka filed a motion to correct an illegal sentence pursuant to Maryland Rule 4-345(a), arguing that his sentence violated the Eighth Amendment as interpreted by the Supreme Court in its recent decisions.  The Circuit Court held a hearing on February 22, 2018 and thereafter denied the motion.

Mr. Jedlicka noted a timely appeal.  The Court of Special Appeals stayed his appeal pending resolution by this Court of several cases that raised issues regarding the constitutional limits on the sentencing of juvenile offenders.   This Court issued a consolidated opinion in *Carter* resolving those cases on August 29, 2018.

In light of the *Carter* opinion, the Court of Special Appeals lifted the stay to resolve, in an unreported decision, four questions presented by Mr. Jedlicka. *Jedlicka v. State*, 2019 WL 2950049 (Md. Ct. Spec. App. 2019). All of those questions concerned the application and interpretation of the *Carter* opinion and recent Supreme Court decisions regarding the sentencing of juvenile offenders. Two of those questions are before us.

First, Mr. Jedlicka argued that his term-of-years sentence, under which he must serve 25 years before he is eligible for parole, was illegal under the portion of the *Carter* opinion concerning *de facto* sentences of life without parole because his sentence denied him a meaningful opportunity to obtain release as required by the Eighth Amendment. Applying the analysis described in *Carter*, the Court of Special Appeals disagreed, concluding that Mr. Jedlicka's sentence was not a *de facto* sentence of life without parole and affords Mr. Jedlicka the meaningful opportunity to obtain release. In addition, the intermediate appellate court noted that Mr. Jedlicka had been convicted of homicide, in contrast to the petitioner in *Carter*. 2019 WL 2950049 at *6.

Second, Mr. Jedlicka contended that his sentence was unconstitutional because he did not receive an individualized sentencing hearing at which the sentencing court expressly considered his youth and attendant circumstances. The Court of Special Appeals rejected that argument, relying on its opinion in *Hartless v. State*, 241 Md. App. 77 (2019). In *Hartless*, the intermediate appellate court had held that the individualized sentencing process described by the Supreme Court's *Miller* and *Montgomery* decisions is required only for juvenile offenders sentenced to life without parole. 241 Md. App. at 83-92.

We initially granted Mr. Jedlicka's petition for a writ of *certiorari* in order to review five questions. On joint motion of the parties, three of those questions were later withdrawn. The questions that remain are: (1) whether Mr. Jedlicka's aggregate 60-year sentence, during which he is ineligible for parole for 25 years, violates the Eighth Amendment and parallel provisions of the Maryland Constitution; and (2) whether Mr. Jedlicka was entitled to the individualized sentencing proceeding described in *Miller* and *Montgomery* and failed to receive it.

## II

## Discussion

### *A. Standard of Review*

Under Maryland Rule 4-345(a), a court may correct an illegal sentence at any time. The legality of a sentence is a question of law that an appellate court reviews *de novo*. *Bailey v. State*, 464 Md. 685, 696 (2019). A sentence that constitutes cruel and unusual punishment under the Eighth Amendment or the Maryland Declaration of Rights is an illegal sentence for purposes of Maryland Rule 4-345(a). *Harris v. State*, 479 Md. 84, 113 (2022); *see also Randall Book Corp. v. State*, 316 Md. 315, 322 (1989).

14

**B.      *Whether Mr. Jedlicka's Sentence Violates the Eighth Amendment***

   1.      Whether the Sentence Equates to Life without Parole

Mr. Jedlicka asserts that his sentence is illegal when it is considered on the spectrum described in *Carter*. *See Carter,* 461 Md. at 346-63.[6]  In Mr. Jedlicka's view, the *Carter* decision established a new form of proportionality review specific to cases involving juveniles convicted as adults.  This is a misreading of *Carter*.  In the portion of that opinion upon which Mr. Jedlicka relies, the Court applied a test for determining whether a lengthy sentence imposed on a juvenile non-homicide offender expressed as a term of years equated to a *de facto* sentence of life without the possibility of parole – the type of sentence that the Eighth Amendment categorically bars for such an offender.  While the Court in *Carter* referenced some of the principles from cases concerning the proportionality of a sentence, it left untouched this Court's existing method of Eighth Amendment proportionality review.  *See Carter*, 461 Md. at 356; *see also* Part II.B.2 of this opinion below.

As explained in Part I.A.1 of this opinion, a court would consider the spectrum described in *Carter* as the second part of a test to determine the constitutionality of a "stacked sentence" – a term of years comprised of consecutive sentences imposed for convictions of multiple offenses – when the cumulative term-of-years sentence would otherwise appear to be a *de facto* sentence of life without parole.  There would be no

---

[6] The approach outlined in that section of the *Carter* opinion has sometimes been dubbed the "spectrum analysis."  Although perhaps a useful shorthand, that phrase may suggest the application of a sophisticated scientific test involving chemistry or physics.  In fact, it is a simple effort to apply common sense to determine the Eighth Amendment constraint on a lengthy aggregate sentence based on multiple convictions.

occasion for a reviewing court to consider that spectrum if the term-of-years sentence was imposed for a single conviction, or if the period of parole ineligibility does not potentially deny the offender a meaningful opportunity for release and therefore does not equate to life without parole.

The Court of Special Appeals properly determined that Mr. Jedlicka's 60-year aggregate sentence, under which he will become eligible for parole after serving 25 years, does not deny him a meaningful opportunity to obtain release and is therefore not a *de facto* sentence of life without the possibility of parole. Mr. Jedlicka bases much of his argument on the fact that he will be eligible for parole 10 years later than if he had been sentenced only to life with the possibility of parole, for which he would become eligible for parole after 15 years in custody. But that does not mean that his 60-year sentence equates to a life sentence. Mr. Jedlicka's parole eligibility date is March 2035, at which time he will be in his early 40s. This is less than the natural life expectancy of a 16-year-old offender, and also less than the typical retirement age. The minimum period of incarceration is also well below the 50-year period derived in *Carter* as the threshold accepted by many states as the point at which a term of years crosses the line into a *de facto* life-without-parole sentence. *See Carter,* 461 Md. at 352 n.40 (collecting cases). Finally, with reference to legislative reforms in other states in the wake of *Graham*, many of those legislative efforts make

16

juvenile offenders sentenced to life with the possibility of parole or lengthy terms of years eligible for some form of earlier release in a range of 15 to 25 years.[7]

Considered against these benchmarks, Mr. Jedlicka's sentence plainly does not constitute a *de facto* sentence of life without the possibility of parole. Thus, there is no need to move to the second step of the analysis and decide where along the spectrum of stacked sentences Mr. Jedlicka's sentence belongs.[8] Mr. Jedlicka argues that the Court of Special Appeals erred in failing to analyze case-specific factors in concluding that his sentence did not constitute life without parole. Those case-specific factors, however, are only relevant if a reviewing court reaches the second part of the analysis.

---

[7] *See* Virginia Code, §53.1-165.1(E) (all juvenile offenders eligible for parole after serving 20 years); West Virginia Code §61-11-23 (all juvenile offenders eligible for parole after serving 15 years); Nevada Revised Statutes §213.12135 (a juvenile offender convicted as an adult of a crime that resulted in the death of one victim is eligible for parole after 20 years); Louisiana Revised Statutes §15:574.4(D)-(G), (J) (most juvenile offenders sentenced to life with the possibility of parole or a lengthy term of years eligible for parole after 25 years); Massachusetts General Laws ch. 279, §24 (first parole eligibility date for juveniles convicted of first-degree murder must be between 20 and 30 years); D.C. Code §24-403.03 (allowing a defendant sentenced for a crime committed before the defendant's 25th birthday to file a motion for reduction of sentence after serving 15 years); Cal. Penal Code §3051(b) (all juvenile offenders eligible for parole after 15-25 years).

[8] If that analysis had a bearing on the issues in this case, Mr. Jedlicka's term-of-years sentence appears to be closer to the end of the spectrum at which a reviewing court should consider a stacked sentence as a single conviction. *See Carter*, 461 Md. at 363. Like the convictions of the defendant considered in that part of the *Carter* opinion, all of Mr. Jedlicka's convictions relate to a single criminal episode; this was not a crime spree during which Mr. Jedlicka repeatedly made the decision to engage in criminal conduct; Mr. Jedlicka was not alleged to be the ringleader; he did not fire the fatal shots; and, indeed, it is not clear that he personally committed any violent acts against the McCoys. However, considering Mr. Jedlicka's stacked sentence as a single sentence has no bearing on our conclusion that it is not a *de facto* sentence of life without parole.

17

When considering whether a sentence is a *de facto* sentence of life without parole, a court considers not only parole eligibility, but also the availability of other routes to a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Graham*, 560 U.S. at 75. JUVRA guarantees an offender a hearing before a judge and the opportunity to present evidence, and enumerates specific criteria for the judge to consider. Mr. Jedlicka is eligible to have his homicide sentence reviewed and potentially reduced after serving 20 years under the procedure created by JUVRA. CP §8-110. Depending on how JUVRA is determined to apply to his aggregate concurrent sentence for his other convictions, he may also have a meaningful opportunity for release under JUVRA.[9]

Finally, the *Carter* analysis for stacked sentences applies to juvenile *non-homicide* offenders. While Mr. Jedlicka asks this Court to consider his 60-year sentence for robbery, assault, theft, and a firearms offense apart from his life sentence with all but 60 years suspended for first-degree felony murder, he is, in fact, a homicide offender.

Mr. Jedlicka's sentence is not an unconstitutional sentence of life without parole under the analysis in *Carter*.

---

[9] As noted in *Farmer v. State*, ___ Md. ___, ___ (2022), slip op. at 26, there are several open questions concerning the application of JUVRA. Of relevance here, the statute provides that an offender is eligible to file a motion after being imprisoned 20 years "for the offense." CP 8-110(a)(3). It is not immediately clear whether an offender serving consecutive sentences could, 20 years into the offender's aggregate term of incarceration, move to reduce the aggregate remaining sentence, or merely the sentence the offender is then serving. The answer to that question may determine the extent to which JUVRA functions as a meaningful opportunity for release. However, the parties have not briefed this question, and we need not resolve it at this time.

18

2.      Whether the Sentence is Grossly Disproportionate

Mr. Jedlicka has sought to recast *Carter* as establishing a method for an as-applied proportionality review specific to juvenile offenders.  In doing so, he has combined two distinct lines of Eighth Amendment case law.  This Court and the Supreme Court have acknowledged that "the Eighth Amendment encompasses a narrow proportionality principle prohibiting 'grossly disproportionate' sentences." *State v. Stewart*, 368 Md. 26, 31 (2002), quoting *Harmelin v. Michigan*, 501 U.S. 957, 997 (1991) (Kennedy, J., concurring).  In *Graham*, the Supreme Court explained that "[t]he Court's cases addressing the proportionality of sentences fall within two general classifications.  The first involves challenges to the length of term-of-years sentences, given all the circumstances in a particular case.  The second comprises cases in which "the Court implements the proportionality standard by certain categorical restrictions." 560 U.S. at 59.  *Carter* is an example of the latter – a case in which this Court considered the application of the categorical restriction announced in *Graham*.

When evaluating a sentence for gross disproportionality, a court first considers whether a sentence appears "grossly disproportionate" by considering "the seriousness of the conduct involved, the seriousness of any relevant past conduct …, any articulated purpose supporting the sentence, and the importance of deferring to the legislature and to the sentencing court. … If these considerations do not lead to a suggestion of gross disproportionality, the review is at an end." *Thomas v. State*, 333 Md. 84, 95 (1993).  If the threshold analysis does suggest gross disproportionality, then the court engages in a more detailed comparative analysis prescribed by the Supreme Court:

19

[A] court's proportionality analysis under the Eighth Amendment should be guided by objective criteria, including (i) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for commission of the same crime in other jurisdictions.

*Id.* at 93, quoting *Solem v. Helm*, 463 U.S. 277, 292 (1983).

This Court recently held that a sentence of life with the possibility of parole was not grossly disproportionate for a juvenile offender convicted of first-degree felony murder. *Harris*, 479 Md. at 122. To be sure, there are distinctions between the two cases. Notably, the defendant in *Harris* was determined to be directly responsible for the death at issue in that case, while Mr. Jedlicka was not the shooter in this case. Mr. Jedlicka also received a lesser sentence of life with all but 60 years suspended. Mr. Jedlicka makes compelling arguments about the relative culpability of juvenile offenders convicted of felony murder. These are considerations, however, better addressed by the General Assembly. Maryland law has long recognized the felony murder doctrine and applied it to both juvenile and adult offenders. A sentence of life with all but 60 years suspended is not disproportionate for the crime of first-degree murder. Mr. Jedlicka has not argued that any of the sentences comprising his term-of-years sentence were disproportionate to the corresponding convictions.

## C.      *Whether Mr. Jedlicka is Entitled to a New Individualized Sentencing Proceeding*

Mr. Jedlicka also argues that the life sentence with all but 60 years suspended that he received for his first-degree felony murder conviction is inherently illegal because he did not receive an individualized sentencing hearing at which the court considered the distinctive attributes of youth. Mr. Jedlicka argues that all juvenile homicide offenders,

20

even those sentenced under a discretionary sentencing scheme, are entitled to this heightened procedure under the Eighth Amendment or, in the alternative, Article 16 and Article 25 of the Maryland Declaration of Rights, the analogs to the Eighth Amendment in the Maryland Constitution.[10]

This Court recently rejected a similar argument in *Harris*, a case in which the petitioner made a similar challenge to the constitutionality of the life-with-parole sentence that he received after being convicted of first-degree felony murder. The Court concluded that parole-eligible sentences are not within the scope of *Miller*'s individualized sentencing requirement. 479 Md. at 116 ("*Montgomery* held that a *Miller* violation can be remedied simply by making an offender eligible for parole, thus sentences that are already parole-eligible cannot also violate *Miller*.").

In his attempt to expand the reach of *Miller* to parole-eligible sentences, Mr. Jedlicka focuses on a passage from *Carter* in which this Court summarized the Supreme Court's relevant Eighth Amendment cases. One item on that bulleted list reads: "With respect to juvenile offenders convicted of homicide[] there must be an individualized sentencing process that takes account of the offender's youth[.]" 461 Md. at 317. That principle was derived from *Miller* and *Montgomery*, both of which specifically addressed life-without-parole sentences for juvenile offenders. The bulleted list was not an effort to

---

[10] Article 16, constraining legislative action, prohibits the making of a law that "inflict[s] cruel and unusual" punishments. Article 25 prohibits the imposition of "cruel or unusual" punishments in the courts.

add to the principles set forth in those cases, and it does not announce a distinct procedural right under Maryland law for all juvenile homicide offenders.[11]

The Court also concluded in *Harris* that the Maryland Declaration of Rights does not provide any additional protections for juvenile offenders sentenced to life in prison with the possibility of parole. 479 Md. at 121. The Court reiterated that, while this Court has repeatedly indicated that "'there is some textual support for finding greater protection in the Maryland constitutional provisions' … we have usually construed Article 25 [of the Maryland Declaration of Rights] to 'provide the same protection as the Eighth Amendment.'" *Id.* at 120, quoting *Carter*, 461 Md. at 308 n.6. Rather than analyze the text of the Maryland provisions to support a divergent interpretation, Mr. Jedlicka bases his argument for a novel construction primarily upon *Leidig v. State*, 475 Md. 181 (2021), a recent decision in which this Court opted to resolve a Confrontation Clause issue on Maryland constitutional grounds rather than under the Sixth Amendment.

The circumstances that compelled the outcome in *Leidig* are not present in Mr. Jedlicka's case. *Leidig* was the product of this Court's effort to resolve a question for which the Sixth Amendment lacked a clear answer, owing to multiple shifts in the Supreme Court's Confrontation Clause cases that have generated significant confusion in the lower courts. While the Supreme Court's interpretation of the Eighth Amendment has certainly

---

[11] As the Court of Special Appeals observed when faced with an identical argument based on *Carter*: "[T]his proposed right [to an individualized sentencing process] would have far-reaching implications for all juveniles who have previously been convicted of homicide in the State of Maryland. If the Court of Appeals intended to recognize this new right, it is unreasonable to believe that the right would be presented via a bullet point summary of Supreme Court authority." *Hartless*, 241 Md. App. at 90.

22

evolved over the last two decades, it is not nearly so murky. Rather than asking this Court to resolve a question that the Supreme Court has not answered, Mr. Jedlicka urges the Court to conclude that the Maryland Constitution offers protection that the Eighth Amendment does not. He has not provided a compelling reason for us to do so for a life-with-parole sentence.

Finally, Mr. Jedlicka argues that a sentence should not be upheld where the record clearly indicates that the sentence imposed was based on improper considerations in the juvenile offender context. He points to the sentencing court's remarks immediately preceding the announcement of his sentence: "In the Court's view, Mr. Jedlicka should not serve a sentence as long as the shooter, but I think he certainly deserves a sentence longer than that given to Mr. Milburn." Mr. Jedlicka contends that the sentencing court *only* considered the sentences imposed on his codefendants in determining his own sentence. The record does not support that conclusion.

Prior to sentencing, the court ordered a pre-sentence investigation report, and defense counsel submitted a 25-page psychological evaluation of Mr. Jedlicka prepared by a licensed clinical psychologist. That report included extensive descriptions of how Mr. Jedlicka's psychological profile and his youth may have impacted his judgment. At the sentencing hearing, the psychologist testified that Mr. Jedlicka's judgment was poor, even as compared to that of a typical adolescent. The psychologist also discussed the influence that Mr. Milburn – who planned the crime – had over Mr. Jedlicka in the absence of a positive male role model in his family. The psychologist opined that Mr. Jedlicka had

23

strong rehabilitative potential and would be a good fit for the youth program at the Patuxent Institution.

Shortly after the psychologist testified, the judge stated that it "was extremely difficult for a judge to appropriately arrive at a sentence in this case" and said he had "thought a long time about this matter." While an appellate court cannot read the mind of the sentencing judge, this record does not support a conclusion that the sentencing judge disregarded either the written report or the live testimony of the clinical psychologist.

## III

### Conclusion

Neither Mr. Jedlicka's life sentence with all but 60 years suspended for the homicide charge nor his concurrent 60-year aggregate sentence for the other offenses is inherently illegal. His term-of-years sentence does not amount to a *de facto* sentence of life without parole, his sentence is not grossly disproportionate, and he was not entitled to any additional procedural protections at sentencing.

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONER.

24